If I may begin. You may begin. State your appearance, please. Thank you. Your honors, may it please the court. My name is Monica Romero. I'm a student at the University of Washington School of Law, appearing on behalf of Marco Santiago, now known as Ashley Raelyn. I'd like to reserve six minutes for rebuttal from my co-counsel, Levi Pauly. This case is about a year-long delay of medically necessary treatment for Raelyn's serious, untreated, and life-threatening gender dysphoria. This court has already held that a delay in medically necessary care can violate the Eighth Amendment. Where the district court erred was failing to recognize that there is substantial evidence from which a jury could find that this delay violated Raelyn's Eighth Amendment rights. Ultimately, your honors, the grant of summary judgment should be reversed. Counsel, when you say the year-long delay, which is certainly what the whole process entailed, depending on when you start and stop it, but you have three individual defendants. This is not against the system generally. Either now or later, can you specify what each one is responsible for? Because as I went through it, I found like a two-month period, four-month period, don't hold me to that, but something like that, that each one, Gage, Harrington, and Light, was really at issue four, and they differed, and some of them overlapped, and some didn't. So can you address that at some point, or are you really claiming that somebody is responsible for the entire time that it took? Your honor, yes, I'll address in detail the evidence from which a jury could find deliberate indifference in this case, but I'd like to take a moment to acknowledge that the Eighth Amendment protects, in this case, Raelyn's right to medical care, prompt and proper medical care, that is. These defendants, while there are three of them who came in at different times, still work together as a team, overlapped, as you acknowledged, and because of the way the Eighth Amendment protects prison inmates... When you say they work together as a team, it's almost like now you're arguing, in effect, like a conspiracy. In other words, are each one of the three responsible for the acts of the other two? Is that what you're saying? No, your honor, but under the Eighth Amendment, the obligation is on the prison, on these defendants, to provide the medical care to Raelyn. I think the point of Judge Boggs' question is, I think our case law in the Eighth Amendment area is prison officials. It's pretty clear that a prison official can only be held responsible for his or her own actions or inactions, and not the actions or inactions of somebody else. Now, are you arguing against application of that principle here? No, your honor, I'm not. I am saying that the Eighth Amendment standard considers medical care provided to a plaintiff, and maybe it will help this court if I can walk through some of the evidence from which a jury could find that deliberate indifference occurred, and specify a bit more where each defendant played a role. To start with the constitutional issue of deliberate indifference, a jury could find the near year-long delay reflects deliberate indifference to Raelyn's needs, and importantly, I might add, reject is pretextual. For instance, when you said a jury could find the long delay, are you putting together all the periods of delay that Judge Boggs mentioned apply to each defendant's actions? In a way, your honor, what we're arguing here is that Raelyn did not receive medically necessary care for a year, and that is due to each of these three defendants' actions. We cannot consider these defendants as individual islands, not interacting with each other, or might I say, resetting the deliberate indifference clock when each new character came into play. And that brings me to this point. A jury could find, or reject this defendant's self-serving explanations as pretextual, and instead consider the following evidence from these defendants to conclude deliberate indifference. The first thing being the length of the delay itself. Almost a year for treatment that we know only took three days to organize and minutes to administer. Aside from that, there's evidence that defendants, more specifically defendant Harrington, failed to comply with the Department of Corrections' own protocols, which require that any deviation from a treatment plan be submitted to and approved by the review committee. Evidence that defendants, specifically defendant Light, failed to respond to multiple pleas for treatment, permitting an inference that he ignored Raelynn outright. Evidence that they prioritized other patients' care, again defendant Light, even as they knew Raelynn suffered from a serious medical condition. On that point, what is your evidence in the record on prioritized others? Is it simply that Light says that he saw cancer patients and heart patients and so on, or is there something more specific about throwing him to the bottom of the pile? Yes, Your Honor. It is exactly that line in Light's declaration about prioritizing care for cancer patients and others that would allow a jury to infer that he did not consider Raelynn's condition serious enough to warrant prompt care. And this is important because it is a serious medical condition. That point is consistent. Is there something in the record where Light says, I didn't consider her a medical condition, or is he saying, you know, I didn't consider it as urgent as some others? He says he did not consider it as urgent as others. And what we're arguing here… Now, if he says that, isn't that a matter of medical judgment? You may disagree with it, but that's valid. Is that evidence of deliberate indifference? It is evidence of deliberate indifference, Your Honor. A jury could consider the fact that she had attempted to castrate herself, was placed on suicide watch, and that castration attempt, importantly, was one that Light treated, and conclude that her situation was emergent. It did necessitate prompt care, and Light did not provide that. And a jury could find that that was unconstitutional. Additionally, there's also evidence that defendants… If I can ask you, even if it was, what's the clearly established law as relevant to Light? Yes, absolutely. It is settled law that a delay in providing medical treatment to an inmate can constitute deliberate indifference where that delay compounds harm. This clearly established law was actually recently reaffirmed by this court in Sandoval. In Sandoval, to briefly summarize, because it collects a lot of very helpful cases that are applicable here and applicable to defendant Light, pointing to decisions and cases presenting materially unsimilar facts, this court stated that if the defendant nurse was on notice there, that it was a constitutional violation to delay treatment for four hours to inmates exposed to pepper spray, or to fail to promptly set a fractured thumb, taking time to emphasize that neither of those are potentially life-threatening conditions, then the defendant nurse was on notice that it was a constitutional violation to delay care to an inmate experiencing overdose symptoms. That is exactly the situation we have here, Your Honors. We have Ms. Raelyn was suffering from anxiety, depression, very well documented that were compounded as she awaited care. She had a history of suicide attempts, and as she waited for her hormone therapy provision, she attempted to castrate herself and was placed on suicide watch. Sandoval and the cases it relies on, in addition to cases such as Hunt v. Dental Department, Lawley v. County of Orange, and Jet v. Penner, all show that the defendants here were on notice that delaying Raelyn's medically necessary hormone therapy, and the harm it compounded in light of the risk of harm that she faced, was a constitutional violation. Doesn't it also require a conscious disregard of the excessive risk? What can you find that's conscious disregard as opposed to, whether you say bureaucratic delay, judgments, as what would make it conscious disregard? Yes, Your Honor. I would point to the evidence that I just previously mentioned, because all three defendants were aware of it. They all knew that she had anxiety, depression. They knew of her history of suicide attempts, and they all knew that she attempted to castrate herself and was placed on suicide watch. Light, importantly, as I had mentioned previously, was actually the one to treat her castration. There is no doubt that a jury could find that all three of them acted in that knowledge. Could you also help me if I'm wrong about this? My impression is Harrington and Light are at the prison in different capacities. Gage is in Olympia as the head of overall treatment or the head of this committee for all the prisons. Is that factually about right? That is correct, Your Honor. In his case, kind of how do you connect him in a culpable way to the goings on at the prison as opposed to his organization of the committee? You know, there are times when they say, well, he was on the docket, but we didn't get the docket finished. And then Gage, at some point, the committee does something. He says, well, I think you need more testing. So how do you, you know, that's why I asked at what point for let's start with Gage because I have a sheet and I'm not sure I'm right. Time period by time period or are you really still relying on the whole year and does the year start with a psychiatrist first or does it start with Santiago's kite? Or does it start with the review for the committee? What's the start date in your view? The start date that Raelynn argues here is November of 2017. That is when she had finished her review with her two treating providers and her case was referred and her recommendation for hormone therapy. Ready for review by the committee is the way that I put it. And the committee then schedules it for February 8th after Christmas and New Year's, and then they don't get to it. And then they convene again and have the committee decision by April 3rd. Is that fair? Or at least the committee consideration. And so all of that time is Gage's unconstitutional action. Well, all of that time is delayed. And it's time that. I'm sorry. Harrington and Light have nothing to do at this point, do they? Well, Harrington at this point in March specifically, and I'll clarify that Harrington was a company engaged on the committee review board and had during that time confirmed that Raelynn had zero contraindications for hormone therapy. So this is part of the delay in considering the fact that Raelynn had been assessed. You said there was zero indication. I thought independent of the committee, Harrington had ordered Santiago evaluated for contraindications, after which none were found. That is at the time that he ordered them, there hadn't been a determination. Your Honor. So Harrington did later on order prolactin tests. I thought and correct me if I'm wrong. My note says March 2nd, Harrington ordered Santiago evaluated for contraindications, and then none were found. Is that accurate? His sheet specifically says, as part of her review, specifically says zero contraindications for hormone therapy. Is that sheet from the March 26th committee meeting? I believe it's record pages 102 and 405 that indicate that finding. We can look at it and find it. I won't interrupt your argument further on that point. Ms. Romero, let me just ask you on the cases that you cite regarding why and clearly established law regarding the delay. It seems like those cases involve more significant, perhaps arguably more significant medical needs and longer delays. And one of them, I think Lolly that you cited in your brief involved a short delay, but a severe medical need requiring immediate attention. None of those cases involve treating gender dysphoria with hormone treatment. Is that correct? That is correct. But none of those cases involve that. However, there is case law from this court and from courts around the nation that establishes that withholding medically necessary treatment for gender dysphoria can violate the eighth amendment. So while those court, while those cases specifically speak to delay, they are still illuminating on the fact that gender dysphoria is a serious medical condition. That point has. I don't think that's contested here. The question is, does it provide, you know, clearly established law for, for the defense here in terms of the notice. But I just wanted to see what your response was to that question. Yes. The answer is yes, your honor. Those cases cited by, collected by Sandoval, as well as the cases. And I believe they're collected in the Edmo opinion, but to just list a few Rosati V. Iguinosa from this court and Norsworthy V. Beard from the Northern district of California, read together say that withholding medically necessary care for people with gender dysphoria can violate the eighth amendment when that happens in the increased risk of self-harm or where it compounds harm. The Supreme court has consistently held that no case need be directly on point. And that is a premise that applies here today in this court as well. Well, I think you're out of time, Mr. Romero. So you want to make a concluding statement? Yeah. Just ask her a question before she. Which I forgot to raise earlier. This is kind of a different subject, but we received notice recently that Dr. Gage has died. You got a copy of that notice, right? Yes, Your Honor. How does that affect your case? Should we just dismiss the case against him? Should, you know, should like, does he have a, you know, some kind of represent representative? What should we do? No, Your Honor, the case should not be dismissed against the late Dr. Gage. When this case continues from here, all that will need to happen is an amendment to the case, to the name caption of this case. However, at this stage at summary judgment and a qualified immunity, it would be inappropriate to dismiss Gage. Well, his story is making a decision against somebody who's dead. Is it? It would be making a determination of liability. However, Gage at the time of these actions was an employee of the state. I understand that, but he's no longer here. So like, should we, like, does he have a, you know, I don't, I don't know anything about Washington propane laws, but does he have like a personal representative or does he have, you know, some, some executive estate or something like that? Have you looked into that? From the notice we were given, Your Honor, it does not look like he has a personal representative yet. Well, have you looked into the question of whether you can continue the suit against somebody, you know, representing the state or something like that? Um, I'd be happy to provide additional. I said, have you looked into it already? Well, no, Your Honor, we have not, but we are, our position is that it would be inappropriate to dismiss Gage because at this level, what is that? What law is that based on? That's what I said. Have you, have you looked into this, uh, a question? No, no, Your Honor. All right. I wonder if I could ask you to do this. Talk to your, I don't know, uh, who's in charge of your pro bono clinic or whoever it is. Is there some lawyer? What was that? Your Honor, I'm sorry. You cut out for a moment. I say, uh, do you have somebody in charge of your pro bono clinic or whatever it's called, right? Yes. All right. A lawyer. All right. Uh, would you, uh, tell that lawyer to look into this question and maybe, you know, he can, if, if, if Judge McGeer thinks it's okay, maybe he can, you know, send us a, uh, a, a short memorandum setting forth the plaintiff's position. And what should we do with the case against Dr. Gage in light of his death? Something like that. Can you, can you do that? All right. Talk to him or her about that. Yes. I think you should look at that. You may not have a case against him. I don't know. I haven't, I haven't researched it, but can you do something like that? All right. Yes, Your Honor. Thank you, Judge McGeer. Yeah, of course. Um, Judge Boggs, do you have any further questions for Mrs. Romero? I'm good. Thank you. Okay. Mr. Romero, thank you very much. Thank you. Mr. Williams. Good morning, Your Honor. Can you hear me? Yes. Thank you, Your Honor. Uh, good morning, Your Honors,       Gage. Mr. Gage, you may be seated. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. This court should affirm summary judgment for three reasons. First, it should affirm on the basis of qualified immunity because none of the actions of defendants violate a clearly established law. Second, this court should affirm summary judgment because none of the conduct alleged in this case rises to the level of deliberate indifference which has been described, defined as conduct approaching criminal recklessness or a total unconcern for the patient's welfare in the face of serious risk. Third, this court should affirm because the evidence shows that all of the defendants were advocating for Ms. Fray-Lynn to receive hormone replacement therapy. But in order to do that, they needed to make sure that the therapy would do more good than harm. And in the interim, Ms. Fray-Lynn was always receiving, was always being provided treatment in the form of psychotherapy as well as other treatments. Your Honor, simply put, caution does not equal deliberate indifference. Your Honor, with regard to the qualified immunity claims, as the Supreme Court noted in Westby, the unlawfulness of the officer's conduct must follow immediately from the conclusion that the rule was firmly established. And the rule must be applicable in the context faced by that official. A general right to be free of delay. Let me ask you a question. The plaintiffs have put forward a case of, in effect, you know, there's been at least a year's delay in the treatment of this case. Now, some of the questioning is, well, you know, there are different defendants involved in different periods. But for instance, should we expect that, or is it reasonable to expect that, you know, say, one of the people towards the end, defendant Light, isn't it fair to expect that he should have known by looking at the medical records about the prior delay and taking that prior delay into account? No, Your Honor. A couple of different things on that. In particular, and I think one of your honors mentioned this in one of your earlier questions, but there is case law in the Ninth Circuit specifically stating that you cannot find liability under the Eighth Amendment because of a team effort. And that appears to be the claim that is being made by opponents. The fact is that each individual person, each individual defendant, we have to look at their own actions and inactions. And from that, we see that, you know, Dr. Gage, at most, delay was nine months and 21 days. Dr. Harrington, at most, about approximately 100, excuse me, one and a half months. And that would be from July 12, 2018, when the GDCRC decided that she was approved psychologically for hormone replacement therapy. And the time that he received on August 30, 2018, the recommendation from the expert. Mr. Light really can only be, in terms of the delay, can only be cited for the time period from August 30, 2018 to, you know, I think it was August, or excuse me, October 12, 2018. All right. Now, focus on my question. My question is, for instance, I think his first reaction was, well, you know, there's no, my appointment calendar is full, right? So I'm going to put her off. And when he made that decision, he should have been aware, shouldn't he? By looking at the inmate's medical record of the months and months of delay that's gone on before, he shouldn't have taken that into account. There's nothing in his testimony that he took that long delay before him into account. Is there? Your Honor, not in his specific declaration, but I think that we need to understand that his, in his declaration, he states that he never received any of these types from Miss Raelynn over that, you know, summer period in 2018, saying that she felt that her condition. The question is this, you see, I mean, he got this case as well. Okay. You know, they want, they want me to do this for her. So he looks at his calendar. It's, you know, it's all full. I mean, no, should he have taken it? Why I have to bump somebody else to put her in? Cause hers is a, is an extreme case. Had he ever thought of that? Well, Your Honor, there's no indication that hers was an extreme case. What, what, he looked at, you know, what, 10 months of delay. And, you know, she just, we've been, maybe the reasons are not deliberate indifference, but, you know, they amount to a long delay, right? Of almost a year. And should he have taken that into account? Uh, no, Your Honor. He can make a decision of when to make an appointment. Well, it doesn't matter. She's been, you know, it's been 10 months or, you know, since she should have had this, uh, this treatment. I'll just put it off for two more months until my next calendar. Until I have an opening. Right? Should he have said, no, I'm going to bump somebody else and put her on, on my current, closest calendar. Why shouldn't he have done that? Well, Your Honor, there's no evidence that he made a conscious decision to delay her treatment in, in any way, or to delay that appointment or to prioritize any other. There's no evidence of, of, of why the only evidence of his, uh, not giving her an immediate appointment was because the calendar was full, right? Yes. From that, since the plaintiff,   is opposition to your motion for summary judgment on behalf of light that, well, you know, he's going to have to make a decision. You can infer that he didn't take all of her conditions into account in, in not putting her, you know, bumping somebody else and putting her on that closest calendar. Right? Um, no, Your Honor, he testified that he could not have, have, uh, approved or had that final appointment with her to give for her to give informed consent until after the appointment, or until after the input was received from the expert on, on August 30th. And there's no evidence that he, he prioritized anyone else. It is just simply that there are other patients with equally serious conditions, but not emergent conditions. And she was handled just like all of them. And there's no evidence that her condition was so urgent that it needed to be treated sooner than, than that. Let me ask, is there at any of these levels of that where, where Mr. Light was concerned, um, a triage? Is there, are there triaging these cases in any way, or, uh, it's not clear from the record, um, that there is a triage sort of approach to these cases. Um, yes, Your Honor, I believe both from the perspective of the CRC, but also from the perspective of the, the medical, um, providers. There, there is, um, a concept that certain, certain conditions are serious and need to be treated, but other times conditions are urgent. And I give you an example, for instance, heart disease. If you have a heart attack, that's an urgent condition. So that would, that person definitely would go first, but a person who needs to be monitored for cholesterol and, and those sorts of things, which are part of heart disease that can be done in your regular, you know, in your regular process. Counselor, could I ask the, the idea that you're giving us, is this based on the light declaration at ER 89 dash 90? Because in effect, as I read that, he says, says he was scheduled to see me, but I was not involved in her care. This follow-up appointment was scheduled for my next available date. To me, that sounds like light wasn't maybe should have been, but wasn't really involved. It was the scheduler or secretary or somebody who said, okay, Santiago, we're, we're ready to go. When can you come? And they look just like when I go to the doctor, they say, they told me next time we can see you is next July. I mean, is that the way you read the declaration? Is there anything else on that point? Does he light address it any other way? Well, well, your honor, that first of all, that yes, that is the declaration we're referring to. And what, what he says is he never received any of these kites from Raylan over this. I understand the kites point, but am I right here that it, it does not sound like light sits down and says, heart attack is worse than cancer is worse than hormone therapy. Is that in more judge McGee is terms. They're probably at least as appears, there isn't any triage beyond that light is there seen patients and whoever is scheduled shows up. Is that fair from your point of view? Yes, your honor. That is fair. He testified that he, he, that she was scheduled into your rights. There is a, another person who does the scheduling and he testified that she was scheduled for his next, next available appointment. First chance that was quote open at that point, somebody else was there. And as judge Tashima says, like they could have bumped somebody else, but we don't know. Let me ask you one other question, because I think your, your colleague and her argument probably had it right. Her than I did about Dr. Harrington in the, in the March period, there is a note at ER four Oh five, which like all doctors notes is not completely legible, but it looks as though Harrington is either affirmatively or reciting no contraindications. And then in his declaration at one Oh two, he says bangs. And I did this, this workup, which led to the prolactin says, I initially evaluated for contraindications. And then so she was subsequently evaluated. Do you have, is there anything else in the record that is, is it true that on March 2nd, Harrington said no contraindications, but then somehow they were looking for contraindications subsequently. Your honor, the record isn't entirely clear on, on that point. But what I would suggest is, is that the roles. So just to, just to basically explain the roles of the GDCRC as opposed to Dr. Harrington, the GDCRC and there is mentioned in, for instance, the July GDCRC report that says there are no medical contraindications. Okay. But that's later after they've done some of these. Yes, your honor. But there's, but there's no indication that the, that, you know, when he necessarily, when Dr. Harrington necessarily knew about the heightened prolactin level. So there were, there were certainly some, some clearly though it wasn't until May, right? Bangs did the bangs, did the workup as I understand it in May and found the prolactin levels, right? Well, what the record shows, and you're correct at ER 102, is that there was a blood workup that revealed that there were elevated prolactin levels, but that is when the it's, it's not entirely clear that that was when they received the information as opposed to, when they ordered the tests for the prolactin levels. So that's, that's, what's a little unclear. Clearly, clearly she did not see bangs until May 9th. That's what it says that she was evaluated. This is from Harrington's declaration. She was evaluated by bangs on May 9th, quote, our workup then uncovered something, but there's nothing that happened before May 9th. As far as the prolactin that I could see, is that fair? Let me ask you just separate question because it hasn't come up, but engages declaration paragraph 16. It says that even though they started hormone therapy, it was stopped very shortly because of another side effect. Does that cut either way? Is that a sign that going in willy nilly isn't always a good idea? Or do we know anything about what happened thereafter? We do know what happens thereafter, but, but in answer to your question, yes, that is, that is exactly what they were concerned about. Not just that condition, but other conditions. That wasn't the one they were, that wasn't the one they uncovered, but it turned out that it happened, right? That's correct. But it, but it speaks to the reason why there should be cause caution. I mean, the basic concept or basic ethical concept for, for doctors is first, do no harm. And that's what they were doing in this case. Let me, can I ask you a question regarding the clinically established law here? Part of our analysis here. Assuming, let's just assume defendants violated Ray Lynn's eighth amendment rights. Is, is delaying medical treatment clear enough or narrow enough? To provide the defendants with the clearly established law under the eighth amendment. No, your honor delay in and of itself cannot, cannot, cannot be enough to get past qualified immunity. And, and the reason your honor goes back to the court's opinion in Westby, the Supreme court's opinion in Westby that the unlawfulness of the officer's conduct must follow immediately from the conclusion that the rule was firmly established. So what that would mean is that every time there was any delay, even 15 minutes of delay, that you would automatically get past qualified immunity because there's this broad general rule. The delay in effect, the delay is, is scalar to the degree of the condition. If the person is bleeding out, you've got to do it right now. And that's where you get these cases then about the thumb is, you know, is falling sideways and so on. So it's not that that it's not that a plaintiff is trying to hold you to every delay. It's saying that the courts and we have to look at the delay versus the condition. And is it enough to say they're deliberately indifferent to say, well, everybody would treat that thumb and we just let it slide as opposed to we have to see how bad it is. We have to weigh it against something else. So it's not that you're trying to say all delays when, but some delays might, right? Yes, that is exactly true. And this, this was this was what the court's opinion was in Mitchell. It stated a delay in treatment to qualify as deliberate indifference for it to qualify. A court must weigh the seriousness of the condition and the ease of providing treatment. So in the obvious situation, like you're speaking of someone has a broken arm delay would not be appropriate, but in this case where, where they're evaluating someone for hormonal replacement therapy, that can be, you know, which is not innocuous. It can be, you know, have serious long lasting consequences. It is appropriate for there to be delay while they are attempting to. But, but even when there's been attempts for self, self castration, I mean, I mean, that's the, that's the main issue that's given me, you know, some trouble here. So what's your response to that? I mean, there's no, and I think what Justine was asking, what I was trying to ask earlier, is there any recognition of that, you know, in, in the record? Yes, Your Honor. A couple of things. When, when that, that self-harm event occurred, it was in January of 2018. Ray Lynn was seen by PA Light, not because he was her provider at the time, but because he was there and it was an emergent issue. And immediately after he brought her directly to mental health and she told mental health, and this is at ER 236, that she would never do it again. This, this mentioned that particular statement is also mentioned in the July 2018 GDCRC report. So they were aware that she had said that she would never do this again. And also with regard to whether she was suicidal, the indication in the, in the record is that the provider, she said she was not suicidal. She did not want to go into observation for suicidal ideation, but her provider, her mental health provider who saw her after this incident thought the incident was serious and that she needed basically a timeout to make sure that, that, that there would be no further self-harming. Was kept on suicide watch for what, a few days, a week, how long? My recollection is maybe only a couple of days at most. Let me ask you, I'm curious whether you believe that Raelynn would have experienced the same, was it 15 months delay under the Washington DOC's newly implemented guidelines? Your Honor, the newly implemented guidelines, which we would first mention are not before the courts. But, but to answer your question, the new guidelines still have a GDCRC. It's just that a provider, if they feel comfortable can, can forego that GDCRC process. The fact is many, many providers do feel comfortable with going to the GDCRC because you're going to people who have a lot, a lot of training. So if you have a psych associate, for instance, they may want this to be evaluated by a psychiatrist or more than one psychiatrist, as Ms. Raelynn's case was evaluated by and by, you know, the chief medical officer and by a psychologist. And so because of that, and because of that training, people often refer, refer their cases to the GDCRC. So there would have been some delay. In any case, there is this ethical obligation to make sure that they do no more, no more harm than good. Judge Mugabe, can I, can I ask a question? I asked the opposing counsel, you represent Dr. Gage, right? Yes, I do, Your Honor. And you filed a notice that he's died, right? That's correct, Your Honor. What does that mean under Washington law? Under Washington law, do these kinds of, I'll call them, torrent causes of action continue against the estate? Yes, they can continue, they can continue against the estate. And the person in Washington is called a personal representative. At the time that I, that I filed this, we didn't know who the personal representative was, and we still don't. But it had just recently, I mean, he had just recently passed. And so we wanted to make sure the court was aware of that fact. The practical, the practical impact of it, though, is that if this court were to affirm summary judgment, it doesn't really matter. The case will be dismissed. And if this court remains, and doesn't affirm summary judgment, then, then the parties, and I believe it would be plaintiff's responsibility to substitute the personal representative. You know, if the court went back, or excuse me, if the case went back to the district court. So when we decide this case, we should just ignore the fact that Dr. Gage has passed on? Essentially, essentially, your honor, as I say, it doesn't, it doesn't make a difference in terms, unless your honor sees some difference that I don't. But it doesn't make a difference if you affirm. And if we remand, then it can be remedied. All right. Thank you. Thank you, your honor. Any other questions? But it would be the plaintiff's responsibility to, to find a personal representative to substitute because we won't get into a state law, but sometimes it's quite interesting or difficult to figure out if there is a personal representative or who they are. Yes, your honor. That's that. That is my understanding that it would be the plaintiff's responsibility. And they would need to serve, serve that, that person, that personal representative to bring them in as a party. Okay. Okay. Your honor, if you have no, no further questions, the defendants respectfully ask this court to affirm summary judgment. Thank you, Mr. Williams. Okay. Mr. Pauly, please state your appearance. Good morning, your honors. May it please the court. As Ms. Romero said, I am Levi Pauly here on behalf of Ms. Rae Lynn. I would briefly like to address two points. First, Judge Tashima is correct when discussing Defendant Light regarding his knowledge of the delays. And then I would also like to clarify or attempt to clarify the Harrington ordering of additional tests for the probactin level. Regarding Defendants Light and Harrington, both, both of their actions came after the GDCRC had deemed treatment medically necessary, which by GDC definition means the treatment is necessary to prevent serious injury, among many other things. And that is correct. Was that the July 16th date when you say, your honor, the committee had found it medically necessary? Yes, your honor. And on summary judgment, the facts must be read in the light most favorable to the non-moving party. Here, the reasonable inference is despite the defendants knowing of elevated prolactin level before July, none of them ever considered it a reason to deny her care. Despite that fact, the reasonable difference from when the lab testing was ordered, which was in August, the reasonable difference is that Defendant Harrington did not order the endocrinology consultation until August. And that that consultation certainly was not completed until August 30th. I would also like to point out that Defendant Light became Ray Lynn's primary care provider in June, at which point it was his job to care for this defendant. However, he didn't even begin providing treatment until after the completion of Harrington's endocrinology consultation. Is there anything in the record that discloses, you know, the delay from the time he became her primary medical care provider to the time when you first did do something? Is there anything in the record that explains that delay? There's nothing in the record that explains that delay, Your Honor. And again, as we mentioned in our brief, we think it's a reasonable inference from the fact that Light was the only provider to not respond to a single kite addressed to him, that in fact, he was ignoring those kites and purposely avoiding Ms. Ray Lynn. But what's the, what's the date of the first of those kites that you're referring to?  I believe they begin shortly after he becomes her primary care provider. Broadly, they are in the excerpts of record between 4.06 and 4.30. But your sequence is basically Light becomes the primary care provider in June. At that point, the papers are up at the committee. July 16th, the committee authorizes treatment and Harrington requests that endocrinology consult. So at that point, is it your argument that Light is showing deliberate indifference by not intervening in some way while the endocrinology consult is going on? Yes, Your Honor. It is because that consultation, if it was in fact ordered after the GDCRC approved hormone therapy, violated DOC policy. Well, but that's Harrington. And would it be wrong if I thought that the first kite was August 6th or 8th? I don't believe that would be wrong, Your Honor, but I would have to check the record. And that's after the, so we have the committee, the committee's authorized stuff is going on. Light is, you know, she is not his only patient, but you're holding him liable for deliberate indifference, even before August 30th. Is that correct? Yes, Your Honor. As the primary care provider for Ms. Raelyn and knowing the personal effect of gender dysphoria, having treated her attempted self castration, defendant Light should have, well, I won't speculate what he should have done, but as Harrington ordered. Why don't you, why don't you tell us what, in your view, what Light should have done? Your Honor, he had an obligation to care for his patient. And as Harrington was violating DOC policy and delaying treatment that was deemed medically necessary, he tacitly approved that violation of policy. And he tacitly approved of an unnecessary test that delayed medically necessary treatment that could have stopped her suffering. But, so then, but what, what practically does that mean? What, what should Light have done? Your Honor, he could have started scheduling her for the informed consent, which was an easy office visit. That way, the informed consent could have been taken care of. Once the endocrinology consultation was completed, he immediately could have ordered the hormone therapy. And three days later, it could have been administered. Once the hormone therapy was ordered, it took three days to administer. And keep in mind, that Ms. Verlin had to prompt defendant Light to actually order the hormone therapy after she gave him informed consent. Your Honor, I'd also like to briefly... But, so that delay, looks like, based on the timeline you just reviewed with Judge Fox, was from August 30th? Um, well, it looks like Brandon submitted several kinds, uh, from August 30th to October 12th. Is that right? Let's say August 30th is the date that I have here. And the hormone therapy begins on November 3rd. Yes, Your Honor. I'm seeing out of time. Is it okay if I continue to answer your question? Yes, please. Um, Your Honor, he took over as a primary care provider in June, and we would start the clock around that time, and especially start the clock after the July 16th GDCRC approval. And the clock would continue until November 3rd, when she finally received her first treatment of hormone therapy. And with that, Your Honors, we ask that you reverse the grain of summary judgment, and that you would send this back to the district court for trial on the merits. Okay. Any other questions? No. Okay. All right, thank you, Mr. Pauly. Thank you both for your oral argument, or all three of you for your oral argument presentations here today. It's very, uh, helpful. And, um, the case of Santiago versus Gage is now submitted. Um, and that concludes our, uh, our oral argument calendar for today. So we are adjourned. Thank you.
judges: Boggs, Tashima, Murguia